IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                  No. 10-MJ-963 LFG

JOSE ARIAS-GARCIA,

        Defendant.

## FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

THIS MATTER is before the Court on Defendant's Motion to Determine Competency [Doc. 20] and on a mental competency proceeding conducted January 18, 2012, pursuant to 18 U.S.C. § 4241.

The Court's function under 18 U.S.C. § 4241(a) is to determine if there is reasonable cause to believe that the defendant may be suffering from a mental disease or defect which would render him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him, or to properly assist in his defense. In making its evidentiary findings, a court may rely on expert opinion as well as the court's own observations of the defendant. United States v. Mackovich, 209 F.3d 1227, 1232 (10th Cir. 2000), *cert. denied*, 531 U.S. 905 (2000).

In this case, the Court considered the expert opinion tendered by Dr. Susan B. Cave, together with the expert opinion of Dr. Robert E. Cochrane, Director of Psychology Training at the Federal Medical Center, with the United States Department of Justice's facility in Butner, North Carolina. The Court also observed Defendant Jose Arias-Garcia ("Arias") during the course of the 2-hour competency hearing, conducted on January 18, 2012.

After consideration of the parties' evidence and exhibits, the Court finds by a preponderance of the evidence as follows:

1. Arias is a citizen of the Republic of Mexico who previously entered the United States without authorization. Following a conviction of a crime, he was deported to the Republic of Mexico [Doc. 1, Criminal Complaint].

2. The Criminal Complaint in this case charges that, on April 2, 2010, Arias was arrested in the United States, within the District of New Mexico, and charged with a felony offense of re-entry after deportation. [Id.]. Arias waived his preliminary hearing, and based on the waiver [Doc. 6, Waiver of Preliminary Hearing], the presiding magistrate judge found probable cause to believe the crime was committed and to accuse Arias of the commission of the crime with which he was charged. [Doc. 5, 4-8-10 Clerk's Minutes].

3. Given Arias's immigration status, his ties to the Republic of Mexico, the nature of the charges, and a detainer lodged by the United States Immigration and Custom Service, Arias was not eligible for release, and, therefore, was detained pending further proceedings. [Doc. 3, Order of Detention].

4. Subsequently, the United States and Arias entered into plea negotiation and Arias agreed to enter a Fed. R. Crim. 11(c)(1)(C) guilty plea under various terms and conditions.

5. The plea proceeding was conducted by the district's duty magistrate judge. However, during the course of the plea colloquy, Arias withdrew from the plea proceeding. [Doc. 9, 6-22-10 Plea Hearing Minutes].

6. Thereafter, Arias's attorney requested that the Court order an evaluation to determine Arias's competency. [Doc. 10, Defendant's Motion to Determine Competency]. The motion was unopposed, and the Court granted the motion. [Doc. 11, Order]. Dr. Susan B. Cave, a clinical and

forensic psychologist, was subsequently designated to conduct the evaluation. [Doc. 12, Clerk's Letter to Dr. Cave].

7. With the assistance of a Spanish language interpreter, Dr. Cave interviewed Arias on July 30, 2010. [Exhibit B, 8/26/10 Forensic Evaluation Report]. She stated that Arias was not oriented as to time, place or circumstances. He had difficulty providing personal information. When he related his medical history, Dr. Cave did not consider him reliable, even as to his own history. [Id., p. 2].

8. Arias reported that he had fallen off a three-story building onto his head and suffered brain damage. He claimed to have metal plates in his cheek and hand. He told Dr. Cave that he was hospitalized at Red Cross Hospital in Fort Worth, Texas as a result of the accident, and was in a coma for three weeks. The accident occurred while working as a roofer, approximately five years prior to the evaluation. [Id.].

9. Arias acknowledged entering the United States without authorization, saying that he and a cousin came across the border to the United States, and that he had "no papers." [Id.]. He told Dr. Cave that he did not know it was a crime for him to come back into the United States. [Id.] However, he did not mention his prior convictions and deportation to Dr. Cave.

10. In reciting his personal history, Arias stated that he was married for about a year, but was not sure if he was currently married or divorced. He stated that he was "fairly sure" that he had no children. [Id., p. 3].

11. At his interview, Arias was wearing a dirty white t-shirt underneath his jail-issued jumpsuit. He appeared to Dr. Cave to be very distracted, looking up every time there was a noise or someone passing in the hall. He acted startled if anyone passed by. He claimed not to know what day, week or month it was; and contended he was unsure if he was represented by a man or a

woman. [Id.].

12. Arias denied drug use, and reported having auditory hallucinations, saying he hears "little noises," but does not understand what is being said to him. [Id.].

13. Dr. Cave attempted to administer the Competency Assessment Instrument-Revised test in the Spanish language. Even though the Spanish interpreter offered clear explanations of the concepts and questions, Arias claimed an inability to understand the instructions. Consequently, the test could not be administered. [Id., p. 4].

14. Arias denied knowing why he was in jail, the criminal charges pending against him, or the nature of any criminal offense pending. He claimed not to understand basic legal concepts, including the role of trial participants, trial proceedings or criminal penalties. [Id., p. 3-4].

15. When asked to describe the role of his defense attorney, he responded "they don't hit me." [Id., p. 4]. He claimed not to understand the role of the judge, prosecutor, the function of witnesses or the responsibilities of his attorney. [Id.].

16. Dr. Cave's diagnostic impression, pursuant to the DSM-IV-TR manual, was that Arias had a cognitive disorder of an unknown ideology. She could not provide an AXIS II diagnosis. While she previously found Arias an unreliable historian, especially relating to medical matters, Dr. Cave accepted Arias's representations concerning his brain damage by finding, "History of 3 weeks in a coma; traumatic brain injury." [Id.].

17. Dr. Cave summarizes that Arias reported a history of serious head trauma resulting in a coma and several surgeries to repair damage. She found significant memory impairment, illiteracy, confusion, disorientation as to time and situation. Ultimately, she concluded that Arias was not competent to stand trial because, "he is so mentally incompetent as to be unable to understand the proceedings against him or properly assist in his own defense." [Id., p. 5].

18. Based on Dr. Cave's evaluation, the United States and defense counsel stipulated that Arias be sent to an appropriate federal institution. Pursuant to the parties stipulation, the Court ordered Arias to be committed to the custody of the Attorney General [Doc. 15, Order Committing Defendant for Competency Evaluation and Treatment]; and he was subsequently admitted to the Federal Medical Center in Butner, North Carolina.

19. Arias spent more than five months at the Mental Health Unit in Butner. With the assistance of a Spanish interpreter, he was advised of the reasons why he was there, and told that he would be evaluated and treated as required by law. [Exhibit A, Forensic Evaluation from Butner, dated 4/5/11; Doc. 18].

20. Officials at Butner advised Arias that the results of interviews and the evaluation would be reported to the Court as well as to the attorneys. When asked if he understood this explanation, he claimed he was unable to state whether he understood. [Id.]

21. While at Butner, Arias was interviewed by a staff psychologist, Dr. Robert Cochrane, and had a psychiatric consultation with Dr. Bryon Herbel. He was interviewed by members of the Forensic Team who had the opportunity to observe Arias throughout the course of his five-month period of evaluation. [Id.].

22. In addition to the clinical interviews, the Forensic Evaluation was based on behavioral observations, a physical examination, an MRI brain scan, and tests administered. [Id., p. 2]. The evaluators also had access to an earlier 2004 report prepared by Dr. Bellah, who apparently was asked to perform a mental evaluation of Arias. [Id.]

23. Arias told Dr. Bellah he was raised in Mexico and had three years of formal education, but could read and write very little. Arias denied ever being married or having any history of alcohol or drug abuse. [Id.].

24. Arias told Dr. Bellah that, at age six, he suffered a closed head injury when he fell from a two-story house. Arias stated, "I broke my head and was in the hospital for a long time . . . . They put plates in my head and face." He could not provide any detail about the fall, as it occurred during his childhood, and Arias said he knew of the fall because of things his mother told him about it. [Id.].

25. The information provided to Dr. Bellah about a fall at age six differed from the information Arias provided Dr. Cave about the fall allegedly occurring five years prior to her evaluation, while Arias was working as a roofer.

26. Dr. Bellah stated that Arias presented himself as consistently confused and unable to understand basic questions; and that Arias professed not to be able to follow even simple instructions to complete any formal psychological tests. [Id.].

27. Dr. Bellah concluded that Arias suffered from some unspecified cognitive disorder, but had not ruled out a diagnosis of malingering. [Id.].

28. Arias's criminal history, obtained by the Mental Health Department at Butner, shows a 1999 conviction for possession of controlled substance; a 2007 conviction for burglary; and a 2009 conviction for giving false information. The criminal history report also showed that Arias has used multiple identifiers, including social security numbers and names. [Id., p. 3].

29. During the course of his medical examination at Butner, Arias alleged auditory and visual hallucinations. He also recounted the roof accident; but this time, stated that it occurred three years before, and that he injured his face, neck, back and arms. [Id.]. This information differed from what he told Dr. Bellah and Dr. Cave.

30. When the Federal Medical Center evaluators asked about his drug use, Arias reported that he smoked marijuana on a weekly basis five years previous. This response differed from

6

information provided to Dr. Cave and Dr. Bellah, as he told them that he did not abuse drugs.

31. To check on claims of brain injury, an MRI of the brain was administered to Arias. The results were negative for any discrete intra cranial mass, mass effect, mid-line shift, or cerebral infarction. In other words, there were no physical findings to corroborate claims of brain injury. Significantly, there were no metal plates in his head, as Arias had alleged. [Id., p. 4]. However, a brain scan only searches for physiological defects of injuries. It cannot detect mental competency.

32. The evaluators at the Mental Health Unit in Butner indicated that upon Arias's admission, he was calm, alert, and in no distress. He had good hygiene, and a hair design, which included a ponytail. His eye contact was sporadic, and he gave the impression of being very confused, distracted, and looking around the room. Arias claimed disorientation as to time, place and setting, and commented that he believed he was in Mexico. [Id.].

33. Arias could not provide details about his personal history, nor the reason for his admission to the Federal Medical Center. He was a poor historian and claimed poor memory for past or recent events. His affect was flat, although he cracked a smile when the evaluator made a joke. He did not have any visible tics, his movements were normal, and he did not engage in any abnormal conduct or bizarre posture. [Id.].

34. While at the Federal Medical Center, Arias was housed in a open mental health unit. Staff observations of Arias during the course of his five-month stay showed that he was well-adjusted to the facility, and he had no difficulty navigating his way around the facility. He demonstrated no problem behaviors. Of significance, "He was noted to socialize with his Spanish speaking peers on a daily basis. His personal grooming and hygiene remained good. In fact, he was observed neatly folding his clothes and maintained a clean room." [Id., p. 5].

35. However, during routine clinical interviews, Arias presented himself as if severely cognitively impaired. He frequently responded to very basic questions with answers unrelated to the questions asked. For example, when asked, "How are you?" he responded, "Yes, I'm here." [Id.].

36. Arias denied knowing the date, month or year. He demonstrated a virtual total inability to understand questions or follow instructions vis-a-vis attempts to administer psychological tests. [Id.]. This conduct appeared in stark contrast to his behavior with peers in the institution.

37. When administered tests, even tests that can be successfully performed by individuals with severe impairments, Arias claimed an inability to perform. Indeed, he could not follow the most simple and basic instructions. For example, he was asked to count from number 1 to number 20, and he professed that he was unable to, or recited numbers in improper sequence. When asked which letter of the alphabet came first, i.e., A or B or D or F, he answered incorrectly to almost every question. [Id.].

38. Evaluators at Butner state that Arias's claims that he could not follow instructions, or his failure rate on these very basic tests raised the specter of feigning a non-existent condition. [Id., p. 6].

39. While attempting to administer psychological testing, Arias claimed not to comprehend even basic instructions. Accordingly, the evaluators sought to administer cognitive malingering screening tests. The first, the Rey-15 memory test, is a very simple recall test using numbers and symbols. No language skill is required. Although simple, the test appears more difficult than it is. The evaluators state that even significantly impaired patients can obtain near-perfect scores. Arias, on the other hand, claimed to recall only 3 of the 15 items. This exceedingly low score is indicative of malingering or feigning impairment. [Id.].

40. A second simple test, the Dot Counting Test, was administered. However, Arias made numerous errors, and the great delay in performing the test suggested to the evaluators that he was feigning impairment. [Id.].

41. The forensic evaluators at Butner concluded that completing this competency evaluation was difficult because little collateral data was available, and the information Arias provided generally proved unreliable. Their report states:

> Based on observations of his behavior, the lack of any clinical findings from the brain scan, and his interview behavior, it appears he was grossly exaggerating cognitive deficits. Presumably, Mr. Arias-Garcia was malingering impairment for secondary gain, that is, to minimize any potential legal consequences from his criminal case.

[Id.].

42. Most significantly, the way Arias presented himself as being unable to understand, unable to perform, and unable to follow even the most basic and simply instruction stood in stark contrast to the evaluators' observations of Arias while he was interacting with his peers in the open housing unit. As indicated, Arias related well to his Spanish-speaking residents. He demonstrated humor in the face of jokes; he was neat, clean and orderly; he managed his life well while in the Mental Health Unit; he engaged in no problem behavior; and was able to negotiate easily throughout the Unit. [Id.].

43. Arias's inability to relate any history, provide personal information or follow basic instructions also seems entirely inconsistent with someone who has been involved in drug activity, has negotiated journeys from the Republic of Mexico to the United States on more than one occasion, has used aliases, used different social security identifiers, has given false information, engaged in card playing, and previously participated in felony plea hearings and admitted guilt.

44. Dr. Cochrane, the Director of Psychology Training at Butner, ultimately concluded that Arias was not willing to answer questions about his understanding of the legal system, and when asked even the most basic questions, his answers suggested that Arias had absolutely no comprehension whatsoever. However, Dr. Cochrane noted that there was nothing to suggest that Arias was truly unable to understand the nature or consequences of the proceedings against him, or unable to assist in his own defense. Arias had no identifiable disorders which impaired his reality testing, his ability to learn basic legal concepts, or his capacity to consult with counsel and to assist in his own defense. Thus, Dr. Cochrane concluded that Arias was competent to stand trial. [Id., p. 7].

45. Upon receipt of Dr. Cochrane's evaluation, the Court corresponded with the prosecuting attorney and defense counsel to determine if they would accept the evaluation or if an evidentiary hearing would be necessary. The Court's correspondence prompted defense counsel to request a follow-up evaluation by Dr. Cave, [Doc. 24, Ex Parte Motion to Appoint Expert Psychologist], and the Court authorized a new evaluation. [Doc. 26, Sealed Ex Parte Order Granting Motion to Appoint Expert]. Thus, a follow-evaluation was conducted by Dr. Cave at the Torrance County Detention Facility on October 12, 2011.

46. Dr. Cave disagrees with Dr. Cochrane's evaluation and his statement that Arias would not follow basic instructions. She states that Arias "could not follow any instructions" and the federal evaluators were unable to administer formal tests, even those designed to be administered to mentally retarded persons. [Exhibit C, November 22, 2011 Letter from Dr. Cave to defense counsel McCray, p. 1].

47. Dr. Cave's statement that the evaluators at Butner could not administer tests is partially incorrect. The standard psychological tests could not be administered because Arias claimed he

could not understand and declined to follow instructions. They did, however, administer the non-verbal Rey-15 memory tests as well as the Dot Counting Test designed to check for malingering. Indeed, Arias's performance on these tests resulted, in part, in the federal evaluators' conclusion that Arias was feigning impairment. [Exhibit A, p. 6]. Moreover, the evaluators' experience with Arias tracks Dr. Cave's experience. Arias would not or could not perform the standard psychological tests, and Dr. Cave administered the same Rey 15 memory test, albeit with different results.

48. Dr. Cave discounted the federal evaluators' conclusions of the stark contrast between Arias's socialization and interpersonal relations with other patients in the open unit, and his alleged inability to follow instructions. She concluded that Arias is simply institutionalized and learned to follow directions as a means to keep out of trouble.

49. Dr. Cave was also critical about the evaluators' comments that Arias was observed playing cards, stating, "There is no direct observation about how well or how poorly he played cards." [Exhibit C, p. 1].

50. Dr. Cave believed that Arias's condition deteriorated from the time she earlier interviewed him. Arias appeared poorly groomed, if not slovenly. During the second interview, he appeared puzzled, confused and disoriented as to time and place. He claimed not to remember ever being sent to Butner, North Carolina, and not spending time at that facility, even though he was there for five months. Arias denied knowing his cell mate's name at Torrance, and claimed that he did not know why he was in jail. [Id., p. 2].

51. On the second interview with Dr. Cave, Arias claimed he was never married although, at his first interview, he told her he had been married for a year or so, but didn't know if he was still married. [Id.].

52. Arias claimed he had no recollection as to how he got into the United States. This statement, of course, contrasts with his earlier statement to Dr. Cave. In the first interview, he told Dr. Cave that he crossed the border into the United States with his cousin. [Exhibit B, p. 2].

53. Dr. Cave administered the same Rey-15 memory test that was administered at Butner, and stated that Arias performed far poorer than individuals with significant impairments. Dr. Cave discounted the performance, saying that she believed Arias had tried to perform. She stated that throughout the interview, Arias gave the appearance of confusion and disorientation. [Exhibit C, p. 2].

54. While at the Torrance facility, Dr. Cave spoke with staff psychiatrist, Dr. Patricia Kelly, who commented that she, too, found Arias to be confused, perplexed and disoriented. [Id.]. Indeed, Dr. Kelly had been so concerned over Arias's disorientation that she contacted his attorney, Ms. McCray, to report Arias's condition.

55. Following Dr. Cave's second evaluation, her conclusions remained the same as before. She believes Arias is incompetent to stand trial. Nothing he said or did indicates any understanding of his legal situation or any ability to grasp even the fundamentals of the trial process. Dr. Cave disputed the malingering findings and indicated that Arias is simply passive, submissive, withdrawn, a poor communicator, and institutionalized. [Id., p. 3].

56. The Court shares the frustration voiced by evaluators at the Federal Medical Center. There appears no clear way to determine competency in a situation such as the one at bar. Either Arias is a skilled manipulator who has maintained an ongoing charade purposely intending to feign incompetence for secondary gain; or, alternatively, he is truly incompetent and cannot understand even simple instructions or directions, is confused and disoriented, and is unable to adequately consult with his counsel to assist in preparation of his defense or understand the trial process.

57. The well-developed body of psychological tests used both by Dr. Cochrane and Dr. Cave requires that the person tested follow instructions and answer questions, and when someone asserts, as does Arias, that he cannot follow even basic, simple instructions, or professes a lack of understanding, the psychological tests cannot be administered. Indeed, neither the evaluators at Butner nor Dr. Cave were able to administer standard psychological tests to Arias for this reason. Moreover, even those tests intended to avoid language barriers and to specifically test for malingering, such as the Rey-15 item memory test or the Dot Counting Test require some degree of cooperation by the examinee.

58. Here, Arias's test results were far below what one would expect even from a severely disabled examinee. Both Dr. Cave and Dr. Cochrane state that Arias's performance was exceedingly poor. However, they come to different conclusions. Dr. Cochrane contends this is clear evidence of malingering; Dr. Cave, while recognizing the poor performance, comments that Arias truly tried to perform the test, but failed.

59. Dr. Cave's analysis is cognitive disorder without a known cause. That conclusion, however, seems linked to Dr. Cave's belief that Arias did, indeed, fall three stories from the top of a building on to the ground, striking his head, and resulting in him being in a coma for three weeks and having metal plates in his head and multiple surgeries. The brain damage is cited in Dr. Cave's initial report and reaffirmed in her second report.

60. However, the MRI procedure at Butner categorically refutes any physical component to allege brain damage. The MRI is entirely negative, and of significance, the alleged plates in his head simply are not there. Moreover, the hospital where Arias claims to have spent three weeks in a coma, and where major surgery was conducted does not exist. Further, Arias has given various versions of the accident: (1) at one time contending that the accident occurred five years back

[Exhibit B, p. 2]; (2) on another occasion, contending the accident occurred when he was a child of six, and that he has no memory of the accident and only knows what his mother told him [Exhibit A, p. 2]; and (3) that the accident occurred three years back [Id., p. 3]. This caused Dr. Cave to conclude that Arias was potentially involved in different accidents. Dr. Cave did state, however, that Arias has scars on his cheek and head, indicating some prior trauma. [Exhibit B, p. 3].

61. Dr. Cave essentially concludes that Arias has virtually no comprehension or understanding. He is continually disoriented as to time, place and circumstance. He is a poor and unreliable historian, and, indeed, provided Dr. Cave with various versions of his history.

62. Arias's criminal history is also troubling in that he has used various aliases and social security identifiers. For someone who claims he does not know why he was arrested and did not know he was committing any illegal act, it would be entirely inconsistent for an individual to use false names or false identifiers. Those names and identifiers are used to avoid detection. So, too, the giving of false information signifies guilty knowledge to avoid detection, and if Arias did not believe he committed any criminal activity, it would have been inconsistent for him to give false information.

63. When asked very simple questions as to which letter in the alphabet comes first or which number comes first, Arias demonstrates confusion and an inability to answer appropriately. Yet, he is observed comfortably playing cards with other individuals at the Federal Medical Center. Someone who lacks even a basic understanding of numbers surely could not manage the process of card games that require sequencing, betting, matching numbers or pictures or other rudimentary knowledge.

64. If, indeed, Arias is engaged in a charade, his deception has been well played. The Torrance County facility psychiatrist, who is not aligned with any party in this case, contends that

Arias appears perplexed and confused. Indeed, this observation prompted her to contact defense counsel to express concerns.

65. Staff at the Torrance County facility reported that Arias becomes confused over which is his bunk, and also reports that his purported state of confusion is commonplace. [Exhibit C, p. 2]. Again, if it was Arias's plan to appear confused, he convinced staff employees at Torrance as to this condition.

66. His own attorney's observations prompted her to request an evaluation. The Court concludes that Arias's conduct, vis-a-vis interactions with his own attorney, caused counsel to believe that there was a significant problem with Arias's competency.

67. The only reason there would have been a prior 2004 evaluation by Dr. Bellah if someone, and some judge during that earlier evaluation, made a determination that there was a significant question concerning Arias's competency. Dr. Bellah found a cognitive disorder of some unknown ideation.

68. Perhaps the strongest evidence against a finding of incompetence is that when Arias was observed for five months at Butner, his conduct was inconsistent with someone who lacks a total understanding, is continually disoriented as to time, place and circumstances, and cannot follow basic or simple instructions.

69. The Court believes that Arias greatly exaggerates his condition, and acts in a manner intended to convince others that he is incompetent. However, even with this "over-egging the custard," the Court cannot explain why so many have had serious questions about Arias's competency, and how, in the absence of incompetency, Arias could continually portray himself in this fashion. This kind of deception would be a virtual full-time job. Nothing in the two-hour courtroom observation of Arias was helpful in reaching any conclusion. He did not fidget as the

hearing progressed. He was well-behaved and made no abnormal gestures or sounds.

70. The Court is required to consider medical opinions presented, and the opinions submitted by Dr. Cave, a highly respected and experienced clinical psychologist, that Arias is indeed incompetent.

71. While there is evidence to the contrary, and while the Court indicated it believes Arias exaggerates his condition, the Court is nonetheless left with the impression of significant uncertainty.

72. Section 4241(a) requires a court to determine only if there is "reasonable cause" to believe the defendant *may be* suffering from a mental disease or defect. The totality of the evidence, although conflicting, does show reasonable cause to believe that Arias may be incompetent. While the Court has doubts, it is not comfortable finding that there is no reasonable cause to believe that Arias "may be" suffering from a mental disease or defect that renders him mentally incompetent.

73. The Court ultimately concludes that Arias suffers from a cognitive disorder attributed to some unknown cause which has rendered him unable to understand the nature and consequences of the proceedings against him, and to reasonably assist in his own defense. Thus, based on the preponderance of evidence, the Court finds that Arias is incompetent.

74. With this finding, the United States must determine whether it wishes to maintain Arias in custody until such time as he can be brought to a state of competency to stand trial, or, alternatively, to release him from federal custody and deport him to his homeland.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge